IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

  v.

TIMOTHY HILLIARD,

     Defendant.

Case No. 19 C 7387

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Defendant Timothy Hilliard moves to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (Dkt. No. 1). For the reasons stated herein, the Court denies the motion. Should Hilliard appeal, the Court finds that a certificate of appealability is not warranted.

### I. BACKGROUND

Defendant Timothy Hilliard challenges his criminal conviction for drug trafficking and gun possession based on a series of controlled purchases of heroin and a heroin for guns trade. *See United States v. Hilliard*, No. 12-CR-970-1 (N.D. Ill. 2014) (Zagel, J.). The transactions involved a Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") undercover officer, a confidential informant, and Hilliard. Unless otherwise indicated, citations in this section correspond with the docket for that criminal case.

On February 13, 2013, the Government indicted Hilliard on ten counts: seven counts of knowingly and intentionally distributing a controlled substance, in violation of 21 U.S.C. § 841(a)(1) (Counts One–Seven); one count of knowingly possessing firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Eight); one count of possessing a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Count Nine); and one count of knowingly possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g) (Count Ten). (*See* Indictment, Dkt. No. 22.) In December 2014, a jury convicted Hilliard on Counts Two through Ten. (Order, Dkt. No. 97.) The jury could not reach a verdict on Count One. (*Id.*) Judge James Zagel sentenced Hilliard to 123 months in prison. (*See* Judgment, Dkt. No. 131.)

## A. The Government's Case-in-Chief

During trial, the parties stipulated that Hilliard's criminal history included two prior convictions: (1) a 1997 conviction in Tennessee for delivery of cocaine; and (2) a 2003 conviction in Illinois for possession of a controlled substance. (12/8/2014 Trial Tr. at 10, Dkt. No. 141.) In its case-in-chief, the Government offered testimony from three ATF special agents: (1) Andy Karceski who testified as an expert in drug trafficking; (2) Chris Labno who testified about his work as an undercover agent

generally and specifically in this case; and (3) Rene Marano who testified that he assisted with the execution of a search warrant at Hilliard's residence. Hilliard's motion focuses on Labno's testimony.

The Government offered Labno as its only fact witness. (*See* 12/9/2014 Trial Tr. at 36–38, Dkt. No. 142.) During his testimony, Labno explained that the investigation in this case involved the use of a confidential informant. (*Id.* at 38.) This informant recorded certain conversations with Hilliard, participated in controlled purchases of narcotics from Hilliard, and introduced Labno, in his undercover capacity, to Hilliard. (*Id.* at 43.) As Labno understood it, Hilliard and the confidential informant had been friends for several years before the investigation. (*Id.* at 43.) Labno testified that he instructed the confidential informant to conduct several controlled purchases of heroin from Hilliard and to record as many related conversations with Hilliard as possible. (*Id.* at 44.)

In total, Labno and the informant conducted six controlled purchases of heroin with Hilliard from March 2012 to September 2012 in Evanston, Illinois. (*Id.*) In December 2012, Hilliard traded a significant quantity of heroin for eight guns and money. (12/10/2014 Trial Tr. at 198–211, Dkt. No. 143.) After this, police arrested Hilliard and recovered more heroin and a gun from

Hilliard's residence during the execution of a search warrant (12/9/2014 Trial Tr. at 46.) Labno testified about his understanding of several recorded conversations with Hilliard, and the Government played the recordings for the jury. (*See id.* at 52–191; 12/10/2014 Trial Tr. at 198–221.) In these recordings, Hilliard discussed various experiences he had with buying and selling controlled substances, talked about things he had learned while in the drug business, discussed transactions involving controlled substances and firearms, and conducted transactions. (12/9/2014 Trial Tr. at 52–191; 12/10/2014 Trial Tr. at 198–221.)

During cross examination, Hilliard's counsel asked Labno whether there was evidence that Hilliard sold drugs to anyone other than the confidential informant:

> Q: Do you have any evidence of any other drug deals from my client to anyone besides the government?
> A: I don't — we were unable to, no.
> Q: There was no video or any surveillance of my client selling heroin to anybody else, true?
> A: That's correct.

(12/10/2014 Trial Tr. at 222.) Later, defense counsel returned to the topic:

> Q: All right. In other words, there's a possible, at least on May 31st of 2012, that you were his only customer?
> A: That's not my understanding, sir.
> Q: Oh, I know it's not your understanding. I asked you whether it was possible.

A: Again, anything is possible, but based – if you're asking what I believe to be the case –
Q: Don't want your opinion.
A: Everything is possible, sir, yes.
Q: I'm not asking for your opinion. But as you sit here today, on May 31st, 2012, you have any facts, any evidence that Mr. Hilliard was selling to anybody but Mr. Romano?
A: Yes, I do.
Q: Tell me.
A: Based on the conversations that he was having with me, the details he was explaining to me, the way he was teaching me to be what he considered a better businessman, a better drug dealer, he talked about selling to other people, he talked about the things he did, he talked about how he operated.

(*Id.* at 282-83.) Hilliard's counsel continued to ask Labno about the same topic:

Q: You never saw him drive anywhere else to make a delivery of heroin, did you?
A: I believe we followed him on occasion where we did meet him and we believed he was doing a transaction but we weren't able to identify anybody involved.
Q: That's a maybe because I never saw a report –
AUSA: Objection.
The Court: The objection is sustained.
Q: Well, could you indicate the report that you documented that?
A: It wouldn't be my report. I wouldn't be out there because, as the undercover agent, I wouldn't be expected or wanted to be covering surveillance deals because if Mr. Hilliard would see me, it would be –
Q: So it's not in a report?
A: No, sir, it is in the report. My understanding is, it's just not in a report that I authored. It was in a report that another agent authored. I believe, in fact, it was listed as part of one of the stipulations as well.

- 5 -

(*Id.* at 284–85.)

At this point, Hilliard's counsel requested a sidebar that was not transcribed on the record. (*Id.* at 285.) After the sidebar, no testimony was stricken, and no additional defense objections are noted on the record. (*Id.*) Hilliard's counsel continued with Labno's cross examination and asked about his basis to believe that Hilliard engaged in another drug transaction that did not involve the confidential informant and Labno:

> Q: You're referring to stipulation number 15, I believe, where it says: "at approximately 6:30 p.m. defendant Timothy Hilliard was parked in a Buick in the area of 8025 Keating Avenue, Skokie, Illinois and talking on his cell phone."
> A: Yes sir.
> Q: "A short time later he drove, his Buick was parking in a lot behind the building at 8025 Keating." Right?
> A: Yes sir.
> Q: And that's what you're basing that there might've been another deal?
> A: Yes. As I said, we weren't able to identify anything specific or any people involved.
> Q: I'm not asking for your opinion. I'm asking, did you see him get out of the car or they saw him get out of the car and deliver a package to anybody? It's not in –
> A: No, sir.

(*Id.* at 285–86.)

Hilliard's counsel also questioned Labno about the confidential informant. When Labno testified about the confidential informant getting a gun for Hilliard—information that

was not included in Labno's report—Hilliard's counsel impeached

Labno:

> Q: All right. And he told you he didn't sell guns?
> A: That's not what he told me.
> Q: What did he tell you?
> A: He told me that he had been a middleman involved in providing Mr. Hilliard a firearm in exchange for crack from another individual –
> Q: Well, I'm glad you brought that up because you actually debriefed him in March of 2012 and he didn't tell you that at all, did he?
> A: No, that's not true.
> Q: Well – One moment. (Brief pause). You actually re-interviewed Mr. Romano on December 17th, 2012, right?
> A: Yes; that's correct.
> Q: All right. And what was the purpose of re-interviewing him in December of 2012
> A: Back in March when we began the investigation, Mr. – – the C.I. had advised that he had been involved in obtaining a firearm for Mr. Hilliard. That he had been a middleman and had connected another person who had a gun with Mr. Hilliard who wanted a gun. At that point I documented that he knew that Mr. Hilliard was aware and in possession of a firearm. Subsequent to that, when we recovered the gun from Mr. Hilliard's house I wanted to learn everything I possibly could about who it was who had given him that gun in the beginning, who the C.I. had hooked Mr. Hilliard up with to get that gun. So at that point we wanted to get more information about that gun.
> Q: Agent Labno, I'm looking at your report from March 20th of 2012, and nowhere in here does it say that Henry Romano told you he had arranged to get a gun for Mr. Hilliard.
> A: No, as I just testified, I said that I documented in the report that he knew that Mr. Hilliard had a firearm and that he knew that he was interested in obtaining more firearms. I didn't document an additional –

Q: I heard that. I heard that. But nowhere, and this is
an important distinction, nowhere in that report do you
actually say that Henry Romano told you that he had
middled, or assisted, or in any way that he was involved
in getting Mr. Hilliard a gun, true?

A: That's correct.

Q: So let's not fudge here and put facts into your
March 20th, 2012 report that aren't there.

A. Sir, I'm not doing that. And I just --

Q. You are.

A. No, I clearly explained to you that I just testified
that I understood that what the C.I. told me was one
thing and I documented it, in summary, that Mr. Hilliard
had possession of a firearm, that he was interested in
obtaining more. I'm not fudging anything.

. . .

Q: I'm going to ask you very specifically, yes or no,
anywhere in this report do you indicate that Henry Romano
told you that he got a gun for Mr. Hilliard?

A: No, sir.

Q: That's all I'm asking. But you're telling me now that
your understanding was, he had told you that?

A: Yes, I was aware of that, I just didn't document it.

Q: Pretty salient point not to document, that your C.I.
is getting guns for my client. Why didn't you document
that?

A: Because we didn't know who he was getting it from.
Our reports are a summary. I put in there the information
that he had. I hoped to gather more information and do
another report on it later.

Q: You never did?

A: I did not.

(*Id.* at 237–43.) During redirect examination, the Government did

not elicit testimony about specific acts of drug dealing by

Hilliard involving customers other than the confidential

informant. (*See id.* at 317–24.)

**B. Hilliard's Case-in-Chief and the Government's Rebuttal**

Three witnesses testified in Hilliard's case-in-chief: (1) Hilliard testified in his own defense; (2) Kevin Sleconich, Hilliard's coworker, testified as a character witness; and (3) Kevin Whitmore, Hilliard's cousin, testified as a character witness. Hilliard's motion focuses on his own testimony.

Hilliard testified that he met the confidential informant in approximately 1997 at the gym. (*Id.* at 360.) Hilliard stated that he and the confidential informant became close friends, and the confidential informant was a guest at his wedding. (*Id.* at 360 & 363–64.) According to Hilliard, he and the confidential informant had previously dealt cocaine in the late 1990s until approximately 2001, and he had obtained one gun from the confidential informant. (*Id.* at 356–61.) An arrest and the birth of his son then caused Hilliard to change his life path, and from 2003 to the time he was arrested on these charges in 2012, Hilliard worked as a full-time truck driver. (*Id.* at 356–59 & 372.)

Hilliard testified that from 2007 onward he would occasionally run into the confidential informant at the gym or other places. (*Id.* at 364–65.) Each time they saw one another, Hilliard testified that the confidential informant asked about buying cocaine from Hilliard. (*Id.*) But each time Hilliard told

the confidential informant that he was no longer dealing drugs. (*Id.*)

In 2010, Hilliard got divorced and moved back in with his mother. (*Id.* at 366.) In late 2011, he reconnected with the confidential informant. (*Id.* at 368-69.) Hilliard testified that he started to see the confidential informant, who continued to ask about the prospect of buying cocaine from Hilliard and would comment about Hilliard's financial and life circumstances. (*Id.*) In 2012, Hilliard's eldest child moved in with him. (*Id.* at 367-68.) As a result, Hilliard felt increased financial pressure. (*Id.* at 368.)

In January 2012, Hilliard testified that he had a change of heart about selling drugs because he needed money. (*Id.* at 373.) Hilliard stated that he told the confidential informant that he did not know anyone who could supply cocaine, but he did know heroin suppliers. (*Id.*) Although the confidential informant initially told Hilliard that he did not "know anything about heroin," he later told Hilliard that he had someone who was interested in it. (*Id.* at 374.) Hilliard then arranged to obtain heroin from his son's mother who had become a heroin addict. (*Id.* at 374-75.) Hilliard testified that he had never sold heroin to anyone besides the confidential informant and Labno. (*Id.* at 375.)

Hilliard testified that the confidential informant "came by a lot," was "kinda being aggressive," and from March 2012 to December 2012 they had several unrecorded conversations at Hilliard's house, the gym, and a bar. (*Id.* at 377–83.) Hilliard testified that the reason he sounded so knowledgeable about drug trafficking and guns during recorded conversations was because the confidential informant had instructed him to impress Labno. (*Id.* at 379–80.) Based on certain phone records, Hilliard testified that he talked about drug dealing with the confidential informant in January and February 2012, before the confidential informant's first debriefing with the ATF about Hilliard in March 2012. (*Id.* at 383–84.) Hilliard testified that it was not his idea to sell drugs, deal in guns, or trade heroin for guns, and that he never would have done any of those things if it were not for the confidential informant. (*Id.* at 384.) Hilliard stated the confidential informant was always "scheming" and asking Hilliard to look out for drugs. (*Id.* at 378.)

On cross examination, Hillard admitted that it was illegal for him, a felon, to possess a gun, but he nonetheless ordered a special weapon for himself from the confidential informant. (*Id.* at 391–92.) Hilliard also admitted that during the guns for heroin trade, he wore gloves when handling the guns to avoid leaving fingerprints behind. (*Id.* at 395.) Hilliard again testified that

he did not have any other heroin customers besides the confidential informant and Labno. (*Id.* at 399-401.) He maintained that any comments he made about other customers were lies he told to impress Labno, as directed by the confidential informant. (*Id.*) Although Hilliard testified that his financial circumstances caused him to start selling heroin at the confidential informant's insistence, he admitted there was no discussion of his financial situation in any of the recordings. (*Id.* at 425-26.)

On rebuttal, the Government introduced phone and text records for Hilliard from September 2011 to June 2012 and a summary chart showing the contacts, or lack thereof, between Hilliard's phone and the confidential informant's phone. (12/11/2014 Trial Tr. at 501-02, Dkt. No. 144.)

### C. Delgado's Complaint Against Labno & Government *Giglio* Inquiries Before Hilliard's Trial

The citations in this sub-section correspond with the docket in this case. After sentencing, Hilliard learned of claims by another ATF agent, Adam Delgado, against Labno. Specifically, Delgado claimed that ATF supervisors retaliated against him after he reported discrepancies in Labno's testimony during a July 2013 trial in a different case—*United States v. Jefferson*, 12 CR 50 (N.D. Ill.) (Lefkow, J.). On February 19, 2014, Delgado filed a whistleblower complaint with the Office of Special Counsel. *See Delgado v. Merit Sys. Prot. Bd.*, 880 F.3d 913, 915 (7th Cir. 2018)

(*Delgado I*). In June 2014, the Office of Special Counsel terminated its inquiry into Delgado's complaint, finding that Delgado failed to provide sufficient evidence to support his allegations of retaliation and that his disclosure was not protected by the Whistleblower Protection Act. (*See* 6/27/2014 & 4/22/2015 OSC Letters, Gov. Resp., Exs. B & C, Dkt. Nos. 27-2 & 27-3.) On July 30, 2014, Delgado appealed that decision to the Merit Systems Protection Board ("MSPB"). (*See* 7/30/2014 MSPB Appeal & 7/30/2014 Delgado Aff., Gov. Resp., Exs. D & E, Dkt. Nos. 27-4 & 27-5.)

While that appeal remained pending, Hilliard's case continued towards its December 8, 2014 trial date. On November 24, 2014, the Government contacted ATF Office of Chief Counsel ("OCC") and the Department of Justice ("DOJ")'s Office of Inspector General ("OIG") to request any *Giglio* or impeachment information pertaining to the ATF witnesses it intended to present at Hilliard's trial, including Labno. (11/24/2014 Letter, Gov. Resp., Ex. F, Dkt. No. 27-6.) Neither the Government nor the ATF OCC can find a record of a response to the inquiry. On January 14, 2015, the ATF OCC responded to a *Giglio* request from the Government on an unrelated case and indicated that it had no *Giglio* information on Labno. (1/14/2015 Letter, Gov. Resp., Ex. G, Dkt. No. 27-7.) According to the Government, "[t]here is no reason to believe ATF

OCC would have had a different response as to Labno prior to the *Hilliard* trial." (Gov. Resp. at 9, Dkt. No. 27.)

As a matter of course, ATF OCC forwards requests for *Giglio* information to the Department of Treasury's OIG. (Gov. Resp. at 9 n.5.) On December 2, 2014, the Department of Treasury's OIG indicated that it had no *Giglio* information as to Labno. (12/2/2014 Letter, Gov. Resp., Ex. H, Dkt. No. 27-8.) On December 5, 2014, the DOJ's OIG indicated that it had no *Giglio* information as to Labno. (12/5/2014 Letter, Gov. Resp., Ex. I, Dkt. No. 27-9.)

The Government also asked its witnesses, including Labno, whether they were aware of any *Giglio* information that they should disclose. (Gov. Resp. at 10.) Labno notified the Government that he was not aware of any *Giglio* information that they should disclose. (*Id.*) At this time, Labno was not aware of the MSPB appeal. (*Id.*) Labno claims that he only became aware of it after Delgado filed a lawsuit on May 5, 2015 and the allegations were described in a civil complaint. *See Delgado v. Att'y Gen. Loretta Lynch, et al.*, No. 15 CV 3976 (N.D. Ill.) (Darrah, J.).

On June 3, 2015, the MSPB dismissed Delgado's appeal. (Initial Decision, Gov. Resp., Ex. J, Dkt. No. 27-10.) Delgado appealed that dismissal, and in January 2018, the Seventh Circuit remanded the case back to the MSPB. *Delgado v. Merit Sys. Prot. Bd.*, 880 F.3d 913, 915 (7th Cir. 2018). Meanwhile, in May 2018, ATF's

Internal Affairs Division received notice of Delgado's allegations against Labno and that Delgado had filed an MSPB appeal claiming retaliation and protection under the Whistleblower Protection Act for reporting those allegations. (6/6/2018 ATF Internal Affairs Incident Report, Gov. Resp., Ex. K, Dkt. No. 27-11.) The Internal Affairs Division decided that no action was necessary on the underlying allegations against Labno and referred the matter to the ATF Chicago Field Division Management for their information. (*Id.*) The MSPB later held a hearing on the retaliation and Whistleblower Protection Act claims and denied Delgado's appeal in May 2019. (*See* Appeal Denial, Gov. Resp., Ex. L, Dkt. No. 27-12.) Delgado again appealed, and the Seventh Circuit vacated and remanded the case with explicit instructions for the agency on Delgado's retaliation and Whistleblower Protection Act claims. *See Delgado v. United States Dep't of Just.*, 979 F.3d 550, 562 (7th Cir. 2020) (*Delgado II*).

Ultimately, the Government never disclosed information about Delgado's complaint against Labno before Hilliard's trial. Hilliard now moves pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his conviction.

## II.  **LEGAL STANDARD**

Under § 2255, a prisoner in federal custody may petition the court where he was sentenced to issue an order to vacate, set

- 15 -

aside, or correct his sentence. 28 U.S.C. § 2255(a). Section 2255 relief "is reserved for extraordinary situations." *Hays v. United States*, 397 F.3d 564, 566 (7th Cir. 2005) (citations omitted). This is because "relief under § 2255 . . . asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007). A petitioner must show that "the district court sentenced him in violation of the Constitution or laws of the United States" to receive relief under § 2255. *Hays*, 397 F.3d at 566–67 (quoting *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996)).

### III.  ANALYSIS

Hilliard argues he is entitled to a new trial because the Government failed to disclose information about Delgado's complaint against Labno before his trial, violating *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). Suppression of evidence favorable to a defendant violates due process where the evidence is material, irrespective of the good faith or bad faith of the Government. *Brady*, 373 U.S. at 87. The Government's obligation under *Brady* includes a duty to provide information that can be used to impeach the credibility of its witnesses. *Giglio*, 405 U.S. at 154. To establish a *Brady* violation, a defendant must show that (1) the evidence was

favorable; (2) the evidence was material at trial; and (3) the Government suppressed the evidence. *United States v. Brown*, 822 F.3d 966, 974 (7th Cir. 2016). The Court addresses these factors as follows.

## A. Favorability

Evidence is favorable if it has exculpatory or impeachment value. *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017). Evidence need only have "some weight" and "tendency" to be favorable to the defendant. *Kyles v. Whitley*, 514 U.S. 419, 451 (1995). Hilliard argues that evidence of Delgado's complaint against Labno was favorable to his case. He claims this evidence would have been useful to impeach Labno. Specifically, Hilliard argues that evidence of Delgado's accusations of perjury would have impacted Labno's credibility at trial, and Labno's credibility was especially important because he was the Government's only fact witness.

The Government argues the evidence was not favorable to Hilliard because Delgado's allegations against Labno were "unsubstantiated." (Gov. Resp. at 27.) The Government contrasts the "unfounded" allegations from Delgado's complaint with other interpretations of Labno's statements and actions, including: (1) Judge Joan Lefkow's opinion in *United States v. Jefferson*, 2014 WL 222726 (N.D. Ill. 2014); (2) an internal ATF review that found no

wrongdoing by Labno; (3) an internal ATF review of Delgado's allegations against Labno that found no cause of action; and (4) an MSPB opinion finding the differences in testimony between Labno and Delgado during the *Jefferson* trial were reasonable and not evidence of perjury. (*Id.*) The Government argues that these other interpretations demonstrate Delgado's complaint is unproven, speculative, and therefore, not favorable to Hilliard.

Delgado's complaint has impeachment value and is therefore favorable to Hilliard. While the Government's competing interpretations somewhat diminish the weight of that evidence, they do not eliminate it. Indeed, evidence need only have "some weight" to be favorable. *Kyles*, 514 U.S. at 451. The Supreme Court's opinion in *Kyles v. Whitley* is instructive here. In *Kyles*, the Supreme Court held that suppressed evidence—a list of cars in a parking lot compiled by police while investigating a murder—would have been favorable to the defendant if presented at trial because it did not list defendant's car at the crime scene. 514 U.S. at 450–51. The Government argued the list was not useful for exculpatory or impeachment purposes because the defendant could have moved his car, or the list could be incomplete. *Id.* The Court clarified that these arguments might diminish the weight of the evidence, but they do not eliminate its favorable tendency toward the defendant. *Id.* at 451.

The Government's arguments against the favorability of Delgado's complaint are akin to those the Government made, and the Supreme Court rejected, against the favorability of the parking lot list in *Kyles*. In both cases, the evidence carries "some weight," and the evidence's tendency would have been favorable to the defendants. *Id.* Both pieces of evidence have some impeachment or exculpatory value. While the parking lot list in *Kyles* did not establish that defendant had never been at the crime scene, it did establish that defendant's car was not there when the police made the list. Similarly, Delgado's complaint does not establish that Labno testified untruthfully at Hilliard's trial, but it does establish that Labno's truthfulness was an issue in the past. This evidence, likely offered during Labno's cross examination as impeachment evidence, could have impacted the jury that ultimately convicted Hilliard. Therefore, evidence of Delgado's complaint against Labno is favorable to Hilliard.

### B.  Materiality

Evidence is material "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 470 (2009). The effect that a piece of evidence "is likely to have had on the outcome of a trial must be determined in light of the full context of the weight and credibility of all evidence actually presented

at trial." *United States v. Morales*, 746 F.3d 310, 316 (7th Cir. 2014) (quoting *United States v. Silva*, 71 F.3d 667, 670 (7th Cir. 1995)). The evidence at issue must be admissible to be material. *See Morales*, 746 F.3d at 314–15.

Hilliard argues that evidence of Delgado's complaint is material. First, Hilliard contends that the evidence would be admissible as evidence probative of Labno's character for truthfulness under FED. R. EVID. 608(b). Second, Hilliard argues that Delgado's specific accusations that Labno lied under oath likely would have affected the trial's outcome. Hilliard maintains that Labno lied at his trial. He argues that evidence of Delgado's complaint would have affected the jury's perception of Labno's truthfulness and credibility, including as to whether he entrapped Hilliard.

The Government argues that evidence of Delgado's complaint is not material for two main reasons: (1) the evidence would not have been admitted at trial; and (2) Labno's truthful testimony was supported by ample other evidence supporting his conviction. As to admissibility, the Government cites Federal Rules of Evidence 608(b) and 403 to argue that unsubstantiated claims are not admissible for impeachment purposes and that the probative value is substantially outweighed by the prejudicial effect. As for other evidence, the Government cites recordings of Hilliard

selling drugs and firearms and talking about his drug trafficking experience that were played at trial, confirming Labno's testimony and independently supporting Hilliard's conviction.

### 1. Admissibility

Federal Rule of Evidence 608(b) permits the introduction of specific instances of conduct that are probative of a witness's truthfulness or untruthfulness on cross examination—an exception to the Rule's general prohibition on the use of specific acts evidence to show conformity therewith. FED. R. EVID. 608(b). But even if a court finds evidence admissible under Rule 608(b)'s exception, it must also consider whether the probative value of that evidence is substantially outweighed by any prejudicial effect. FED. R. EVID. 403. The question is whether evidence of Delgado's complaint satisfies these rules such that it would have been admitted at trial.

The Seventh Circuit addressed a somewhat similar issue in *United States v. Wilson*, No. 07-3099, 2008 WL 5207276 (7th Cir. Dec. 12, 2008). In *Wilson*, the Seventh Circuit considered whether a district court improperly granted the Government's motion to preclude the use of citizen complaints filed against two police officers for impeachment. *Id.* at *5. The Seventh Circuit found the district court acted within its discretion "to determine that cross-examination into the specific instances of alleged

misconduct would have been of limited probative value." *Id.* The Seventh Circuit further clarified, stating accusations that the police officers "engaged in misconduct were merely that: accusations [that] offered little indicia of reliability." *Id.* Accusations alone are not enough. Even if filed as formal complaints, accusations lack sufficient indicia of reliability and have limited probative value.

The Seventh Circuit's conclusion in *United States v. Saunders* is also helpful. 166 F.3d 907 (7th Cir. 1999). In *Saunders*, the district court precluded Saunders from cross examining the Government's FBI agent expert witness regarding findings in an internal DOJ investigation of the FBI laboratory. *Id.* at 911. The Seventh Circuit stated that "investigation resulted only in a finding that, in other cases, [the agent] supplemented a dictation and presented a conclusion that could have been more thorough." *Id.* at 920. The investigation "pertained to an entirely different case and revealed no bias by [the agent]; it found that [the agent]'s errors in two other cases were not willful and recommended no disciplinary action." *Id.* Saunders maintained that use of the evidence would show bias in favor of the Government. *Id.* at 911. The Seventh Circuit disagreed. *Id.* at 919-20. The Seventh Circuit acknowledged that cross examination on this point might have impacted the FBI agent's general credibility, but it "would not

have exposed a bias in favor of the government." *Id.* at 919. Indeed, "a report concluding that the agent was not biased simply cannot be probative of his bias." *Id.* Thus, the Seventh Circuit found the district court properly barred the evidence pursuant to Rule 403, "finding that the potential prejudice far outweighed the extremely limited probative value." *Id.* at 920.

Like the investigation findings excluded in *Saunders*, the evidence of Delgado's complaint pertains to an unrelated case. In *Saunders*, the investigation resulted in a finding that the agent was not biased, meaning it could not be used to show bias. *See id.* at 919. The allegations in Delgado's complaint were also investigated and did not result in a finding that Labno lied, gave false testimony, or perjured himself. Hilliard questions that investigation's rigor, citing Delgado's appeal of the MSPB's dismissal of his retaliation and Whistleblower Protection Act claims to the Seventh Circuit. While Hilliard cites to *Delgado I*, 880 F.3d 913, the Seventh Circuit has since issued *Delgado II*, 979 F.3d 550.

In that opinion, the Seventh Circuit vacates the agency's decisions on Delgado's retaliation claim—retaliation "he believes he suffered after reporting his suspicions that [Labno] may have committed perjury during a federal criminal trial." *Delgado II*, 979 F.3d at 553. While the Seventh Circuit comments on the

responsibility of federal managers and supervisors to investigate protected disclosures like Delgado's, see *id.* at 555, it does not substantiate Delgado's claims about Labno. Nor could it. The appeal addresses Delgado's retaliation and Whistleblower Protection Act claims against the ATF. It does not address the veracity of Delgado's underlying complaint against Labno. Regardless, whether the agency conducted an appropriate investigation into Delgado's complaint is not a question the Court can decide here.

Hilliard also argues Delgado's accusations are reliable because he is a "highly credible source," "had a great deal to lose" in reporting, and reasonably believed them to be true. (Reply at 2 & 12, Dkt. No. 30.) Yet, none of these things remedy the issue. They do not substantiate Delgado's allegations. As the Seventh Circuit said, Delgado had suspicions about Labno. *Delgado II*, 979 F.3d at 553. Mere suspicions or accusations of conduct lack sufficient reliability for admission into evidence at trial. *See Wilson*, 2008 WL 5207276, at *5. For these reasons, the minimal probative value that evidence of Delgado's complaint might have is substantially outweighed by the potential prejudice. Evidence of Delgado's complaint against Labno would not be admitted at trial.

### 2. *Reasonable Probability of Affecting the Outcome at Trial*

Even if evidence of Delgado's complaint were admissible, it is not reasonably likely to have affected the outcome at trial.

First, the evidence itself has little weight because it stands alone, unsupported by other evidence. While evidence of Delgado's complaint may have had some general impeachment value for Hilliard, its weaknesses make it unlikely to outweigh evidence to the contrary that was presented at trial. Second, and perhaps more importantly, the jury did not depend solely on Labno's testimony to reach its verdict. The Government also presented several recordings of Hilliard engaging in transactions that involved controlled substances and firearms and recordings where Hilliard appeared to demonstrate knowledge and experience in buying and selling these items. This evidence stood independent of Labno's credibility and showed predisposition. Telephone records offered by the Government on rebuttal also undermined Hilliard's argument that he was induced to act. The Government presented ample evidence, beyond Labno's testimony, for the jury to discredit Hilliard's entrapment defense and convict him.

The Seventh Circuit's reasoning in *United States v. Souffront* is helpful here. 338 F.3d 809, 820 (7th Cir. 2003). In *Souffront*, defendants convicted of drug charges challenged the Government's failure to disclose that an officer who assisted in locating evidence during the search of a defendant's apartment was accused of stealing narcotics in an unrelated case. *Id.* At trial, the Government presented other evidence of the offenses, including

physical evidence of drugs and testimony from other witnesses. *Id.* at 817. On appeal, defendants argued the Government's failure to disclose the accusations against the testifying officer would have served as evidence to impeach the officer's credibility and was therefore material to their case. *Id.* at 821.

The Seventh Circuit found this failure to disclose did not entitle defendants to a new trial. *Id.* The court noted that defendants had not demonstrated that the officer's testimony was false. *Id.* The Seventh Circuit then cited corroborating evidence presented at trial, including testimony from other witnesses and the physical evidence. *Id* Ultimately, the Seventh Circuit found that, even if the Government had disclosed the evidence earlier, there was "no reasonable probability that the outcome of the proceeding would have been different." *Id.*

Similarly, evidence of Delgado's complaint is not reasonably likely to have changed the outcome of Hilliard's trial. Like the accusations against the officer in *Souffront*, the accusations against Labno related to a different case involving a different defendant. At Hilliard's trial, the jury heard Labno testify and assessed his credibility. Hilliard's lawyer challenged that credibility on cross examination. As the Seventh Circuit noted about the officer's testimony in *Souffront*, Hilliard has not established that Labno's testimony was false. The Government

presented the jury with other evidence beyond Labno's testimony at trial, including several recordings of Hilliard discussing drug transactions and his involvement in drug trafficking. The Government also presented phone records rebutting Hilliard's testimony about his repeated contact with the confidential informant. Considering the full context of the weight and credibility of all the evidence presented at trial, sufficient evidence beyond Labno's testimony supported the jury's decision. It is therefore not reasonably probable that evidence of Delgado's complaint would have changed the outcome. Because evidence of Delgado's complaint would not have been admissible and would not have changed the outcome, it is not material.

### C. Suppression

The Government has a duty under *Brady* to provide material, favorable information about its witnesses to defendants in criminal cases. *Giglio*, 405 U.S. at 154. Failure to provide such information constitutes suppression under *Brady*. 373 U.S. at 87. Hilliard argues the Government suppressed evidence of Delgado's complaint against Labno. Although Hilliard's counsel properly requested *Brady* and *Giglio* material, Hilliard never received information about Delgado's complaint. While Hilliard has "no reason to doubt that the Government prosecutors acted in good

faith," he contends that ignorance does not justify the Government's failure. (Mot. at 14, Dkt. No. 13.)

The Government acknowledges that certain supervisors in the ATF Chicago Field Division knew about Delgado's MSPB appeal by at least July 30, 2014. The Government notes, however, that there is no evidence that the trial team, including the prosecutors and Labno, had actual knowledge of the MSPB appeal. Despite noting that suppression does not turn on the Government's subjective intent, the Government also states there is no evidence of bad faith. Ultimately, the Government argues that, even though the information was not produced, it was not suppressed because it is not material or favorable.

The Government failed to provide Hilliard with the information it had about Delgado's complaint against Labno. Irrespective of the Government's intention, its failure to produce the information is an undisputed fact. Even if the Court imputed the ATF Chicago Field Division's knowledge of this information on the trial team, see *United States v. Burnside*, 824 F. Supp. 1215, 1257 (N.D. Ill. 1993) (discussing the "prosecutorial team" concept and whether it relieves the Government of its duty in certain circumstances), whether the evidence was suppressed under *Brady* depends on whether the information is favorable and material. While the information is favorable, it is not material. Thus, the

information was not suppressed as that term is defined under *Brady*. There was no *Brady* violation, and Hilliard is not entitled to a new trial.

## IV.  CONCLUSION

For the reasons stated herein, the Court denies Hilliard's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (Dkt. No. 1.) Should Hilliard appeal, the Court finds that a certificate of appealability is not warranted.

**IT IS SO ORDERED.**


_____
　　　Harry D. Leinenweber, Judge
　　　United States District Court

Dated: 1/12/2021